Thank you, Judge Christin. May it please the court, I'm Jeff Clark from the Justice Department here on behalf of the president and the two cabinet secretary defendants. I will split appellant's time with Mr. Rosenbaum, who will take five minutes. I'll reserve four minutes for rebuttal and proceed now for 11 minutes. This is an extraordinary case. Not only did the district court permit judicial review directly against the president, it vacated an entire section of an executive order. Judicial caution and modesty should have been the watchword here and yet it wasn't. Ordering such an unprecedented vacature required the district court to pierce through a host of solid threshold defenses and to go on to misconstrue section 12a of the Outer Continental Shelf Lands Act as a one-way ratchet that would allow a president to withdraw lands from exploration and production, but not allow any future president to restore them to the state of Alaska, for instance, depends on for its revenue and to support thousands of jobs. I could speak on all of the relevant defenses and certainly I'm available to answer any of three points. First, this case is wildly premature. There are five highly reticulated stages of agency action on the shelf relevant here, each tied explicitly to permitted judicial review in a particular level and type of court. First, there's seismic testing, which can overlap with stage four on exploration. Second is a five-year planning process that identifies areas to be leased to be reviewed in the D.C. circuit alone. Third, putting out bids for tracks to be leased, those are actions reviewable in the district courts. Fourth, the exploration stage of the leased areas, those actions are reviewed in the regional circuit. And lastly, the development and production from the leased areas, something that's also supposed to be reviewed in the regional circuits. We haven't even hit any of the initial stages. There's been no permitting for seismic testing here. There's been no five-year plan, yet the plaintiffs sued the president five days after the executive order was signed, before the ink was even dry. May I ask, just before you go on with your argument, you said there's been no permitting. I just want to make sure that that is the state of the record. What we have, I believe, is that six permits had been previously requested and denied, and those were essentially pursuant to the secretary's order going to be reconsidered. Is that the last word we've got in this record? Yes, so there's been no granting of a permit, and there's been no application for a permit in the Alaska area, as far as I'm aware, and I did check recently. Thank you. Sure, and can I ask, just before you move, I don't know if you're going to move off standing, but it seemed to me standing was the strongest of the threshold barriers you had asserted here, and I guess my question is, let's assume that the plaintiffs have established that there is at least enough of a causal connection between the seismic, what do you call it, the seismic? Testing. Testing, yeah, and the harm that they're complaining of, the injury, in fact. I agree with you that, yes, there is this, kind of, there's a long chain of things that need to happen between now and the time that the harm will be inflicted, but I guess I read the court's cases as just saying all they were asking now is whether there was a substantial risk that the president's signing of the executive order would ultimately lead to that harm, and it strikes me as, if that's all we're talking about, a substantial risk, I would have to say yes, because it seems the very purpose of the signing of the executive order was to encourage it, in fact, to hurry along the seismic testing that's not a necessary step in that long chain you just laid out, so maybe you can just speak directly, why isn't there a substantial risk that that harm will ultimately be felt? So, your honor, I think that if all you had before you was the executive order, and, you know, you did just sue as soon as five days after that was issued, you might think it was imminent, but here we are three years, one month, and two days after the lawsuit was filed, and three years, one month, and a week after the executive order was issued, and there's still been no permit granted, and we don't think that you can possibly complain about injury from, you know, seismic testing when Congress has given you a very particular remedy, so I think that's obviously part of our rightness argument, but it's also part of standing imminence, I mean, the notion that there was imminent injury here when the permits haven't issued even that long, three years plus ago, it's like Methuselah, you know, level of imminence, we don't think it is. I don't think imminence is necessarily limited to the concept of shortness in time, and we know that from the Department of Commerce case, right? Because the injury there wasn't going to be felt for some time after the sending out of the census question, right? Yeah, the census case is the one I'm thinking of, but so I guess I don't, I hear you, yes, the timing is maybe, now we know a couple of years out as opposed to a matter of months, but I don't think that's fatal to their standing here. So, your honor, look, I think that our justiciability arguments are interconnected, so let me bring you back again to rightness and say we're dealing with a highly reticulated scheme, and it's a scheme that under the case of the Secretary of Interior versus California, the Supreme Court held that the Oxlade judicial review scheme was designed essentially to forestall review, and it's clear if you have the ability and the need before you can proceed to get permits for seismic testing, and those permits haven't even been issued yet, that you don't have a right case within the meaning of the statute. Hang on, depends on what the harm is that they're complaining of, right? In this case, I think one of Judge Watford's questions had the baked in assumption of, you know, a several, I think what he called a long chain, it's just as a hypothetical, so I'm going to change the hypothetical, because my understanding is there's one more step. They need a permit before seismic testing can occur, but let me just make sure I'm right about that, that's what has to happen? So, they need, there's one step they clearly need, that's the one you just mentioned, Judge Kristen, but they also, in terms of a company that would actually be going out to do the testing, because of the allegations of harm to marine mammals and the like, they would also need incidental take, incidental harassment authorizations from the Secretary of Commerce, and so that also, you know, is something that, you know, isn't done and makes this case not right. So, can you go back to Judge Watford's question, because I agree with him, and I'm not sure that you got a chance to answer his question about the standard for standing in, articulated in Commerce, Susan B. Anthony, Bennett, Davis, and this is a tricky area, because, but it seems to me that the recent cases have very clearly articulated this standard, substantial risk of harm. Do you agree that that's the standard we are aiming for? So, Your Honor, I don't think that the census case changed the standing standards. I'd point you more specifically to the environmental standing cases. I'd point you in particular to Summers v. Earth Island Institute, where there was a vast area... Summers is a factually distinguishable council. Summers is so factually distinguishable. Your Honor, respectfully, I think it's actually, you know, worse from the standpoint of not being able to show standing. In that case, the geographical area involved, once the particular, you know, timber sale was kind of resolved and off to the side in terms of, you know, an attempt to challenge regulations broadly, that involved an area the size of Texas, and the court thought that that was basically the equivalent of a Lujan someday intention to visit somewhere. Here we're talking about 128 million acres, which is more than a half million, you know, square kilometers, and the best their standing declarations say is that sometimes ships will get within hundreds of kilometers of doing the seismic testing will get within hundreds of kilometers of affected creatures. That's just not, that's a vast area, and they don't have... Forgive me, I didn't mean to cut you off. Go right ahead. I want to hear your question. I apologize. Well, I didn't mean to talk over you. It's just that this doesn't seem to me to be the for the plaintiffs. You know, it's a very large area, no question about that. But this seems to be a function, the harm that they're claiming seems to be a function of the type of testing and the very long, long range of testing, and it can go on for a year. And all of what we both read, of course, all of us read about the air guns. Hence my question, following up on Judge Watford's view of the applicable standard. Is there something you Yes. So unlike this, I think, you know, one of the key cases is the California case, the Secretary of Interior versus California, where basically, you know, if you're talking about pre-enforcement's review, you're talking about a situation where Congress can channelize that, right? Because the ordinary background rule of rightness is you have to wait until something, you know, actually does hit you before you can challenge it. And pre-enforcement review schemes are exceptions to that. Here, you have an incredibly detailed system that as I was explaining, requires litigants to proceed in particular courts at particular times, once particular stages have been teed up and have become final agency action. You don't have final agency action here on permits. You have an attempt essentially to just sidestep this entire carefully crafted regime by Congress, which if that happens, you know, you know, soon, you're not going to have cases in which people follow the procedures that Congress set. And in California, the Supreme Court specifically said that the design of that system in Oxlock was to forestall review. So here you have, you know, basically an attempt to just end run that and run smack dab into it. We also think Ohio forestry, which was an attempt to challenge a broad, you know, forest plan, the Supreme Court rejected that as unright. And then more recently, this court in a Tosca case, decided that it's called safer chemicals, decided that that challenge to pre-enforcement challenge to regulations by the EPA was not right. So I, that's what I would say on unrightness. It strikes me that those cases stand for the notion that rightness is a function of the, of the, of the type of claim that's brought. That's certainly correct, your honor, but you obviously have to look at the statutory regime and make sure that it's not being set for not by the action that we're talking about. You know, if we actually, these folks are talking about is the action that the president took in executing the executive order and your, your actions seem to be talking about something different. Your arguments seem to be geared at something different. Your honor, respectfully, this is highly relevant because if you're talking about our arguments about Larson, if you're talking about our argument about the lack of a statutory cause of action, both of those arguments in terms of the ability of plaintiffs to proceed without a statutory cause of action or in a non-statutory review action under Larson, they can be displaced by congressional statute. That that's the Armstrong case. The Supreme court held that the Medicare statute displaced any ability to proceed outside that statute. I wasn't talking about cause of action. I'm focusing on your prudential standing argument. Yes, your honor. But the prudential standing argument obviously ties to the nature of the statute and the regime for review that the statute establishes. And again, the plaintiffs are trying to end run all of that and say that they have these kinds of remedies that exist. And these, these pathways that exist outside of that and whether those pathways exist outside of that depends on the notion that they have not been displaced. They have been displaced by the OPSLA statute, which was incredibly detailed, incredibly thought out. And as the Supreme court said in California designed to displace and forestall review until later stages. Here again, there's no permit that's been granted for seismic and that's their best argument as to why they have standing. Can I ask if you're able to move to the merits? Yes. So on the merits, your honor, I would say that we think that this statute is clear that the phrase from time to time is a phrase that the plaintiffs are rendering superfluous. The statute would mean exactly the same thing. If you took the from time to time phrase out, if you look at the fact that that same phrase appears in the constitution in article three, section one, to mean that the, uh, the Congress can create inferior courts, it has created them, abolished them, modified their jurisdiction. The ordinary meaning of from time to time as a phrase of art in the law is that things can be modified. They can be revoked. Supreme court has abolished. Uh, I'm sorry. The Congress has abolished courts in the past. I'm not sure why you're using the constitution for this argument, counsel. And I'm curious about your interpretation of the other place within Oslo where this phrase is used. So there are three other places in the statute, your honor, where it appears. It's in, this is all 43 USC, 1335 A1, 1347 C, and 1351 H3. And we think in each of those instances, let me just take, uh, I think 1347 C is the one about, uh, uh, regulations. I mean, obviously Congress was not imagining that regulations were a one-way ratchet. They could be changed. They can under the APA be repealed. Uh, so when Congress structurally use this phrase from time to time in the same way in the statute that, uh, you know, it's being used in, in 1341 A section 12 A of the session law. So when I look at the phrase in, in section eight, for example, wait, do I have that right? Is it section six? Um, section six, uh, the phrase there seems to be from time to time meaning that it's not a one shot deal. Uh, in other words, I, I think you're right that meaning has to be given to this phrase. I think that we can't read it out of the statute, but I'm wondering why the more persuasive read isn't, isn't that, um, what we said in, in Ray community voice, for example, that Congress didn't, uh, clearly didn't intend for the agency to exercise or not exercise the 31 time and then just walk away. Um, so it wasn't, for example, when we talk about section 12 A, it wasn't the case that Congress intended, surely that only president Eisenhower would have the opportunity, um, to execute these withdrawals, but that future presidents would as well. And I'm wondering that strikes me as a more persuasive read. Just want to give you an opportunity to respond to that. So your honor, I'll, I'll be quick on that before I reserve my time for rebuttal, but I think that's certainly true, right? Like the, the entire statute, especially in terms of his history, uh, you know, versus, uh, president Truman would have been still born if basically, you know, president could have at the day after an accident who said, I'm reserving all these lands. He would have, you know, occupied the field, precluded all future presidents from, uh, taking land, uh, uh, and putting it back after it had been reserved. And, you know, I, I would say that, you know, I'd refer you to our strategic petroleum reserve analogy. While it's true that one way, one reason you could reserve would be for environmental purposes. That doesn't mean that that's the only reason to reserve. The original reason to reserve is to have a savings bank of oil and mineral resources that you can tap when you need them, especially for national security purposes. And with that, your honor, if you'll allow me, I'll reserve my time. Can I, can I ask just one additional question on the merits? I know where we are going over. Of course, and we'll put some more time on the clock. We've taken quite a bit of your time, so we'll put a few more minutes on the clock. Judge Watford, go right ahead, please. Okay, thank you. This is just one discreet line of inquiry. I just want to make sure I understand your position correctly. Um, let's assume that, uh, um, a president withdraws and sets a date certain for when that's going to expire, but it's, you know, a date that extends into his or her successor's, uh, term, right? So it extends beyond the president's own term. Um, your view is that a, a successor president does not have to honor that. In other words, if the, the date were set in, you know, 2030, um, the very first day in office that a new president came in, um, that president could just say, well, I'm revoking that. Um, uh, it's, you know, basically the, the withdrawal ends as of the end of the prior, my predecessor's term. Is that, is that correct? I think, your honor, that presidents are entitled to hope that their successors will, uh, be persuaded and, you know, exercise suasion. Uh, so, you know, I, I don't think presidents lightly come in and just automatically reverse things, but yes, the, the, the answer to that is yes. But one quick observation then maybe before I reserve time, which is that, um, you know, this is a, a reservation, uh, clause in the statute, which the judge found to be ambiguous. And I think that's the best case for the, for the plaintiffs. Um, but it's not just ambiguous in terms of Congress's handoff to the president. It was ambiguous here as to president Obama's, uh, uh, action in, in what was, uh, changed by president Trump. That's because it's not a, they keep saying in their brief that it's a permanent withdrawal. It's not, it was a withdrawal without a definite expiration for that time period. That's not the same as permanent. President Obama didn't even assert the authority that plaintiffs are claiming exists here, nor did the district court find that that authority had been asserted. With that, if I could, if I could reserve. Certainly. Counsel? Wait, we got to get the clock straightened out here. Oh, okay. Go right ahead. I think it's Mr. Rosenbaum's turn at this point. I have five minutes. Well, uh, you, you, you have a total of two minutes left on the clock. Um, we can go ahead and put, uh, four minutes on please. Go right ahead. May it please the court, Steve Rosenbaum for the Intervenor American Petroleum Institute. This, the Supreme Court has made clear that longstanding practice can inform the proper interpretation of a statute that comes from the new process case, the Saxby case, and the Midwest oil case, which interestingly was in many respects, the opposite of this case in the sense of the opportunity for the executive to withdraw land. And yet the court found that such a power could still be inferred. Here, the reality is that the plaintiff's position is one that withdrawals are permanent and cannot be changed. And yet, if that position is correct, we would submit that all five of the last presidents have applied the statute incorrectly. And of course, the result in conclusion should be that it's the plaintiffs who are wrong, not those presidents. And I say that because there have been 13 withdrawals in the history of the OCS. The government has counted them up, and I'm added as the 13th, the one that's under legal challenge now. Of those 13, eight of them were either non-permanent on their face, or they were revoked, or they were modified. And that is a long history establishing that the statute should not be interpreted as a one-way ratchet. President George H. W. Bush in 1990, when he imposed his first withdrawal, did so only until 2000. Specifically, this was not a permanent withdrawal. Rather, the requirements, the powers were, by his own actions, applied flexibly. Just to follow up on a question I was trying to pose to your colleague, I guess the interplay between Section 8 and Section 12, I guess I just, I don't see why we would read Section 12 in the way you and the government are suggesting when basically all that the president is entitled to it seems to me under your reading, is to have the withdrawal remain in effect while he or she is in office. And after that, it's all bets are off. Obviously, the president can accomplish that through directions under Section 8 to his or her Secretary of the Interior. So I just don't, why would Congress have given the extra power in Section 12 if it was going to be constrained in the way that you're advocating? We do not agree with that reading in Section 8. And we do not agree that's the relevant section either. The relevant section is Section 18. Section 18 is the five-year leasing program. That is the program where every five years a president must determine which areas will be open for leasing during the next five-year period. That's where you decide what areas are in or not. But there are specific statutory requirements that are imposed upon the There's a long list of requirements. The president is not free to direct the secretary under Section 18 not to include an area. That decision is made based upon the statutory criteria. Are you saying that the statute compels a president to grant leases? I'm saying that the president, well, I'm saying the secretary must follow the Section 18 requirements to determine which areas are open to leasing. The president can trump that by exercising his power under Section 12. We are reconciling Section 12 and Section 18. So let's say that the president does not exercise any withdrawal power under Section 12. I'm just asking you, do you read the act as compelling the president to grant leases in certain areas during his or her term in office? Well, I am, if the criteria, if the, I mean, his secretary of interior is required to follow the dictates of Congress in Section 18, which require a slew of factual determinations. Factual determinations, if they are, if the facts support leasing, then yes, he's compelled to do that. Sure. Just like any other executive officer. And I started with what Mr. Bush did, but Mr. Clinton, President Clinton, excuse me, did the same thing. His withdrawal was simply a time limited one. And he said, and I can revoke this and this can be revoked in the interest of national security. It doesn't appear in the face of 12A, but he imposed that requirement. Then in 2017, the second President Bush modified President Clinton's previous withdrawal to allow the North Aleutian Basin to be leased. No challenge that was brought. You're significantly over your time. Could you please wrap up? Okay. As I say, I think my final point would be that the provision cannot be interpreted to contradict the purpose of OCSLA. Your sister circuit said the act, the OCSLA has an objective, the expeditious development of OCS resources. 12A cannot be interpreted consistent with that to allow any president to determine for all future presidents that large areas or indeed all areas of the OCS are off limits. Thank you. Thank you. May it please the court. My name is Eric Grafee and I'm here with my co-counsel Catherine DeSormo on behalf of the plaintiff appellees. With the court's permission, we'd like to split our time as follows. I would like to spend five minutes addressing standing and ripeness and Mr. DeSormo will spend 15 minutes addressing the merits and the other jurisdictional issues. Go right ahead counsel. Thank you very much. Now plaintiffs have made a fact specific showing of standing due to concrete and imminent harm from seismic surveying. And I'll just point out that the relevant timeframe for assessing standing is the time we filed our complaint. And at that time, the record shows that seismic surveying was imminent. First, the very purpose of the executive order was to speed leasing and exploration in the Outer Continental Shelf, including specifically to expedite and streamline seismic surveying. The industry trade group representing specifically the seismic industry immediately issued a statement praising the areas without delay and specifically saying that exploration should happen before the five-year planning and leasing. So before any of the other OCSLA stages. How many permit applications are pending please? In the Atlantic, there are five. In the Arctic, there are not any. But it isn't surprising that there hasn't been a rush to do seismic. We filed our case five days after the executive order was issued. And seismic surveying, as the government acknowledges at page 20 of its brief, is very capital intensive. And so it stands to reason that the survey areas would hold off pending our resolution of our lawsuit. And in fact, the government has specifically tied its freezing of the five-year plan to our lawsuit and to the resolution of our lawsuit. Does anything else have to happen other than a permit issuing in order for the seismic surveying to go forward? No, there are permits that issue and then seismic surveying can go forward. And another piece of evidence that I'd like to highlight for the court as to imminence is that just six months before we filed our complaint in the Arctic, the government completed an environmental impact statement assessing the impacts of seismic surveying. That environmental impact statement predicted multiple seismic surveys would happen in the near future and looked at foreseeable scenarios, reasonably foreseeable scenarios of those. And the very purpose of the EIS was to expedite permitting and avoid delays in permitting of that seismic surveying. And that's at 68, 70, and 72 of our supplemental excerpts of record. And in addition, just one month before we filed our complaint, a seismic operator did and that's at 184 of our supplemental excerpts of record. So all of these record evidence shows that at the time we filed our complaint, seismic surveying was indeed imminent. And I will also address the fact that the record shows that harm from seismic surveying is incredibly widespread. It's uniquely widespread and harmful activity. And that evidence is that the government itself concluded in the EIS for the Arctic Ocean that the seismic surveying it anticipated in the near term would cause quote notable changes in behavior over the entire Arctic Ocean for key species like the bowhead whale. And I'd point you to 135 through 6, 107 through 8, and 149 through 150 of our supplemental excerpts of record for the government's own conclusion about the widespread effects. And our members, as we've submitted in our declarations, use and enjoy these species throughout the Arctic and would be harmed. And this is exactly the type of evidence that this harm for standing in CBD. And then finally, as to the, as to rightness, you know, we are challenging the executive order, the 12A decision, not any of the other decisions mentioned in the other parts of OXLA. And that decision, that action meets the Abbott labs test, final, fit for review, raises strictly legal questions. And the government has pointed to absolutely no harm for, of itself for adjudicating that claim. Now, if there are no further questions, I will yield my time to Ms. DeSarbo. I'm sorry, counsel, I have a, I have a question for you. I'm troubled by what I see as a connection between the rightness argument and the government's argument that you can't get injunctive relief against the president. And in your brief, near the end, there's a statement that even if injunctive relief is not available against the president, perhaps the district court judge shouldn't vacated part of an executive order that you could get injunctive relief against an circles back around to the rightness issue, because secretary of the interior hasn't taken any action. I don't think there's any action on behalf of any of the secretaries that you could take an injunction against or who were named as a defendant available. And so how is, does that not then undercut rightness? Well, your honor, as to rightness, we would be, as this relates to rightness, as opposed to remedy, which my colleague Catherine DeSarbo can address, we would be harmed by having to wait for a permit to issue as opposed to bringing our claim now. But how? Because until the permit is issued, and I think there's something else that has to happen unless the entity wants to risk criminal prosecution, they also have to have these well, a number of things happened first, a third party, that's a non party to this lawsuit has to decide to seek a permit, then the secretary has to go through their procedures and decides granted, then that non party has to get other permissions to make sure they're not violating any other laws, then they have to have a capital, then they have to go forward, all these things have to happen. And if you wait until the secretary issues a permit, how does that put you in any position different than what you're in now? Well, we would be very unlikely to be able to protect our interests if we have to wait till there's a permit. But why? You were able to file a lawsuit within five days of the issuance of an executive order. Why can't you file a lawsuit when the we were challenging the executive order and not the permit specifically, but the permits issued very close in time to when activities happen on the water. And I would point you to an example on page 19 of our supplemental excerpts of record there, the public was notified of a permit under the Incidental Harassment Authorization for the Arctic on October 24. The permit was effective October 17. So seven days prior, and in column three, you can see the boats were already on the water at that time. So the permits seismic would be happening would be upon us and it would be very difficult for us to get into court in time to adjudicate our claim about the executive order. Okay, so even assuming that happened, I'm sure you could run into court and seek a preliminary injunction and make, you know, reasonable arguments that there should be an injunction issued until the matter could be resolved. I just don't see how your position is any different if you wait till there's actually an action to challenge, as opposed to what I view as a the vacating of the portion of the executive order is another way of enjoining the president. But it seems as you would concede in your brief, you need an injunction against a secretary. Well, I would say about seismic, we agree with the government that if we were to get an exec, we couldn't enjoin seismic surveying on the basis that the executive order is unlawful. Seismic survey can go in areas that are withdrawn, as well as that aren't, it's a practical matter, they wouldn't because you wouldn't go try to find where oil is in an area where that's closed permanently for leasing. So it wouldn't be an effective way, the seismic would happen, the incentives would have changed by the time a permit is issued, because the seismic companies would have invested already in that operation, and would be inclined to do it. But if there are no further questions, I would like to make sure that court has a chance to hear about the merits and pass it over to Mr. Swarmo. Certainly, go right ahead, counsel. Thank you, Your Honor. I'd like to turn to the merits. Section 12A authorizes the president to withdraw from disposition beyond these lands of the outer continental shelf. It is expressly unidirectional and absent from 12A is any mention of the opposite authority to revoke a withdrawal later. Congress knew how to draft a statute that way. It had done so repeatedly. In the Forest Reservation Act, Congress authorized the president to reserve lands as forest reserves, and also to modify or vacate them later. In the Reclamation Act, Congress authorized the Secretary of the Interior to withdraw land for irrigation works, and also to restore them to public entry later in his discretion. And in the Pickett Act, Congress authorized the president to withdraw lands for specified purposes and also to revoke those withdrawals later. So over and over again, Congress has shown when it wants to give the president both withdrawal authority and the separate opposite authority to put lands back into circulation later, it says so expressly. So, counsel, your opposing counsel characterized your position as positing that the withdrawal can only be permanent. Is it the plaintiff's position that a president could not modify or revoke a withdrawal that that very president had issued, for example, President Obama revoking and modifying a withdrawal that he had entered earlier? Is that allowed under your interpretation of the statute? No, Your Honor. And the reason is because when Congress passed Oxley in 1953, it was legislating against the backdrop of nearly 100 years of attorney general opinions interpreting Congress's withdrawal authority, delegations of withdrawal authority. And the attorneys general in the 1862 Rock Island opinion, again in the Castle Pinckney opinion in 1938, just 15 years before Oxley, repeatedly said, when the president withdraws lands under an express delegation from Congress, his power is exhausted. Once he makes that withdrawal, his job is done. It's now up to you. So are you drawing distinction in your statutory scheme between a withdrawal like the one we're talking about that was made by President Obama, which did purport to be, I'll say, permanent and subject to Congress, of course, and its power pursuant to the property clause, versus a time limited withdrawal? So when you answer Judge Beatty's question, are you drawing that distinction? I can't tell. No, and I'm glad you asked that, Your Honor. The interveners in particular tend to conflate time limited withdrawals with revocation of withdrawals. And those are two distinct concepts, and I want to disentangle that. The text clearly allows the president to withdraw lands from disposition. It doesn't matter whether that includes the power to put a time limitation on the withdrawal to the resolution of this case. So the district court said that's probably within the terms of the statute when the president withdraws land, he can put an expiration date on the withdrawal and say, I withdraw these lands for 10 years, for 14 years, as George H. W. Bush did and as Clinton did. That's still a withdrawal. A withdrawal of either type, a permanent withdrawal like the one that President Obama made, or a time limited withdrawal, either way, it's binding on the executive branch. And that's the critical distinction between a withdrawal and the revocation of a withdrawal at any time. And there are three reasons why it's critical to read 12A withdrawals as binding on the executive branch. And one is the one that Judge Watford, that you mentioned in your colloquy with the government's attorney, which is in order to give Section 12A a meaning that's distinct from Section 8, Section 12A withdrawals need to bind the executive branch, at least for a discrete time if they have an expiration date. If 12A withdrawals were simply the president saying, I'm going to hold off on leasing this area until I change my mind, that is no different from an action under Section 8. I'm sorry, I couldn't hear the last part. You said it's no different from what? I'm sorry, from an action under Section 8. Section 8 makes leasing permissive. It doesn't require the... I'm not sure that I agree with you, and I'm not sure that we need to reach that. It's tough enough to figure out what we've got on our plate, which is where there is a withdrawal that's been made that is not time-limited. But be that as it may, could you circle back to Judge Beatty's question, please? Assuming that we're talking about a withdrawal that's not time-limited, under that circumstance, what is your definition of permanent? Does it just revert to Congress? That's right, that's right. For a withdrawal that's not time-limited, once President Obama made that withdrawal, his power was exhausted, as the he had no more authority to go back and undo it than any future president would. So there's no difference between President Obama and a different president. Once the withdrawal is made, it is inviolate. And Congress, it's up to Congress to determine whether to put those lands back into circulation. Can you clarify how Congress does that? So do they have to amend ASCA? Do they do an Appropriations Act? Do they do a separate bill that changes the effect of the president's withdrawal? And of course, if they did all those things, that legislation would then be subject to presidential veto, assuming it happened in this, well, in any term. But if it was the very president who issued the withdrawal, that seems to be a hollow remedy for Congress to exercise their rights under the Property Clause. Well, your Honor, I think the answer would be Congress would do that by legislation. Congress has done that. In OCSLA itself, of course, in Section 13, Congress revoked President Truman's withdrawal of the entire OCS, the Naval Petroleum Reserve. So Congress knew how to do this. And in 2006, another example is GOMESA, the Gulf of Mexico Energy and Security Act, which is Public Law 109-432. And at Sections 103 and 104 of that law, Congress pruned back part of President Clinton's withdrawal, and it mandated that the Secretary offer leasing in one area of the Gulf. And then it provided that the Secretary shall not offer leases in a different area of the Gulf until the year 2022. So Congress itself is fully capable of making these granular decisions about, yes, we want to leave these lands withdrawn, or no, we don't, we want them to be leased again. And 12a is a tool that Congress included in OCSLA to vindicate Congress's own ability to decide the best use of OCS lands. So by leaving revocation authority out of the statute, Congress retained for itself that power. County, you keep fading out. I'm sorry, but I got the first part of it. What did you just say? By what? I'm sorry, by leaving revocation authority out of the statute, by omitting it from OCSLA, where it included it in other public land statutes. Congress deliberately kept for itself the power to put lands back into circulation once they've been withdrawn, if it so chooses. Thank you. You can just keep your voice up as you go forward, please. I will, yes. Sorry, Your Honor. And I just want to very briefly note, I see my time is growing short, but I just want to briefly note there's a reason why Congress bakes in this action in certain respects. When the President, through his Secretary of the Interior, decides to lease OCS lands to a third party, and the third party extracts those resources, they're gone forever. And that binds the President's future options, his successor's future options, and it binds Congress's options. So section 12a, which is part of a portion of the statute called reservations, is a salutary counterbalance to the general pro-disposition thrust of the statute. Congress wanted a counterweight to leasing, so that the President, when he saw some important reason that the power of leasing should be sent back to Congress, that the question should be taken out of the Executive Branch's ambit and sent back to Congress, he could do that. And this doesn't take away flexibility from the President. Under section 8, the President can tell his Secretary of the Interior, let's hold off on leasing that area until I change my mind. That's a section 8 function, and President Obama did that, in fact, in 2010 after the Deepwater Horizon oil spill, where President Obama announced he was canceling a planned lease sale in the Gulf of Mexico. He kept the authority to change his mind, because it wasn't a 12a action, it was a section 8 action, and indeed later those lands were leased. So when the President uses section 12a, he is sending the question back to Congress, and he has no more authority than anyone else does to undo that withdrawal. Your Honors, I would just end quickly by saying, we have not, we never sought an injunction against the President personally. We asked for injunctive relief against the agency officials tasked with carrying out the President's order, and we asked for declaratory relief. The District Court gave us vacatur of section 5 of the Executive Order, which essentially functions as declaratory relief, telling agency officials, don't rely on section 5, it is not the law. That is wholly within the District Court's discretion, and it's fully consistent with this Court's decision in San Francisco versus Trump two years ago, in the case in which there was a separation of powers challenge to a presidential order directing agency officials to withhold funding from sanctuary cities. This Court agreed that was a violation of the separation of powers, and it agreed that the plaintiffs were summary judgments. It disagreed with the nationwide nature of the injunction that the District Court ordered, but on remand, the government agreed to a settlement, vacatur, I'm sorry, enjoining section 5 of that order in the state of California. If there was no separation of powers problem with the remedy there, and surely there wasn't because the government agreed to it, there is no separation of powers problem with the District Court's vacatur here. Can I ask you one question about the language of the withdrawals? Why, in your view, does it connote permanency as opposed to just, you know, I guess I kind of think of it as, if President Obama really wanted to protect these areas for future generations, maybe he could have said, you know, until 2080 or 2090, whatever, but by using the language that he did, why isn't that kind of just punting the ultimate setting of an expiration date to his successor? Your Honor, I read it as giving the choice of an expiration date to Congress. Congress can always set an expiration date. The President didn't, and that phrasing, without specific expiration, is, I will admit, a little flowery, but it's a phrase that has appeared in non-time limited withdrawals since President Clinton's, to distinguish time limited withdrawals on the one hand from unlimited withdrawals on the other. Every other indication in President Obama's withdrawals talks about, you know, ensuring that these resources are, remain safeguarded for future generations, it talks about very long-term generation level concerns requiring protection for these areas, so there's every indication that President Obama meant these withdrawals to be until Congress intended otherwise. Do you know why that specific phrase was chosen, though? Because it's no natural, I mean, it's just such an unnatural way of conveying permanence, or why wouldn't you just say forever, you know, or something like that, that like a normal person would say, so why is that? Do you know, is there some reason why those magic words were chosen? I don't know, Your Honor, I've wondered that too. There are a lot of ways in which executive orders are worded differently from how people normally talk, and I don't know why that particular phrase made its way into the 1998 withdrawal, but it has appeared since then. Every time a president makes a withdrawal that doesn't have a baked-in expiration date, so it expires of its own force when it's permanent from the executive branch's perspective, that's the phrase that presidents seem to use. But one of the things that President Obama said, a word he used was revoke. When changing the scope of a withdrawal, and that would suggest, given the natural and normal meaning of the word revoke or revocation, that President Obama believed that as president, he had the right to modify or change or revoke a withdrawal. And given the actions of other presidents who changed, modified in some way, or limited previous withdrawals, it would seem that all these other presidents thought they had that right as well. What should we make of that? I know the government's argued acquiescence on the part of Congress. How do you respond to the fact that it seems that the last at least four presidents or so have viewed the statute in what seems to be consistent with the government's position? I have a few responses to that, Your Honor. If I may, I see I'm over my time. May I quickly? First of all, presidents can't give themselves power that Congress has denied. So by saying that, whatever presidents thought the scope of their power was, and we can only guess because we have no executive branch interpretation of 12A allowing anything other than withdrawals until the position that Department of Justice has taken in this litigation. Whatever presidents thought the outer limits of their authority was doesn't give them a power that Congress has denied. Obama's use of the phrase revoke in his 2014 withdrawal memorandum, I read that as a paperwork matter. He was revoking a prior withdrawal memorandum, which was time-limited, and replacing it with an unlimited withdrawal memorandum. So not a single acre of the OCS was put back into circulation. It wasn't a revocation in the sense that President Trump's revocation was, which put lands back into circulation. All right, I will wrap up simply by saying we requested the court affirm the district court's judgment and thank you for your time, Your Honors. Thank you. Thank you all. Mr. Clark, the government has gone significantly over its time, about five minutes, but I allowed that for opposing parties as well. I'll put two minutes on the clock for you if you'd like rebuttal. Thank you, Your Honor. Very generous. I'll try focus on the merits and rebuttal. First, I'll start with this argument about Section 18. I don't think that argument works because basically, it depends on the rebuttal that was launched is under Section 18 about plans that the Secretary of Interior gets to decide on. And as Mr. Rosenbaum noted, that statute is suffused with shalls. Now, it does note that the Secretary uses his best judgment about the energy needs. I would suggest to you that while it's not a mandatory duty to issue a plan, it's certainly something that's subject to review for abuse of discretion. It's not something that's committed to agency discretion by law. And for that reason, the plaintiff's theory about how to say, well, everything should be under Section 8, and therefore, Section 12a has to be permitted. I think that that theory does fall. Counselor, you think that a private party could compel the president to authorize leasing of an area? Well, Your Honor, to be clear, under Section 18, right in the plans, we're not talking about compelling the president. We're talking about the Secretary of Interior. So certainly, if the Secretary of Interior abuses his discretion in failing to look at all the factors and basically said, we're not going to do any drilling, ignoring all the factors, that would be reversible in an ordinary EPA case. Absolutely, Your Honor. The second thing I wanted to say was, as Judge Kristen said, which I think adverts to the fact that at best for the plaintiffs, this statute is ambiguous. I also think it's ambiguous in terms of the handoff to President Obama and how he exercised it, the language without specific withdrawal. In that instance, we would call for deference to the president's decision. We would call for deference to that because he is looking at all the purposes of the statute, national security, trade policy, having a strategic reserve of resources that can be tapped at the appropriate time. And then in terms of that language, what I can say is that the Office of Legal Counsel reviews everything for form and legality. And it's not an accident that this language has been perpetuated over time. I see my time has expired. If the court has no further questions, I would ask that you reverse the district court. Thank you. Thank you all for your very helpful arguments. We'll take this matter under advisement and stand in recess.
judges: Christen, Watford, Bade